Clarice Marie MAREK, Plaintiff,

v.

Arthur S. FLEMMING, Secretary of Health, Education, and Welfare, Defendant.

Civ. A. No. 12929.

United States District Court
S. D. Texas,
Houston Division.

March 30, 1961.

Dillingham, Schleider & Lewis, Ben H. Schleider, Jr., Houston, Tex., for plaintiff.

William B. Butler, U. S. Atty., and Robert C. Maley, Jr., Asst. U. S. Atty., Houston, Tex., for defendant.

INGRAHAM, District Judge.

This is an action under Section 205(g) of the Social Security Act, as amended (hereinafter "the Act"), 42 U.S.C.A. § 405(g), which provides for judicial review of a "final decision" of the Secretary of Health, Education, and Welfare, consisting here of a decision of August 25, 1959, by a referee in the Office of Appeals Council, Social Security Administration (Tr. 6–11), which became the Secretary's "final decision" when, on November 30, 1959, the Appeals Council denied plaintiff's request for review (Tr. 1, 2). The claimant, Clarice M. Marek, filed application for survivors insurance benefits on August 20, 1957, which application has been denied in the above administrative proceedings. It has been held below that claimant was not the legal widow of the deceased wage earner, Schuerenberg Joseph Marek, and that her children, Gale E. and Marla Jo Swafford, were not the stepchildren of the decedent within the meaning of the amended act. In this review proceeding defendant-Secretary now moves for summary judgment.

The issue to be determined is whether claimant and her two children by a former marriage are entitled to survivors' insurance benefits based on the social security account of Schuerenberg J. Marek. The particular facts to be determined are whether a valid marriage existed between the claimant and the wage earner within the meaning of the Act; whether the claimant is the legal widow of deceased wage earner; and whether her children have the status of stepchildren of decedent.

Section 202(d) of the Act, 42 U.S.C.A. § 402(d), provides that every child (as defined in Section 216(e) of an individual who died insured is entitled to monthly benefits, if the other conditions of entitlement, not here pertinent, are met.

Section 202(g) of the Act, 42 U.S.C.A. § 402(g), provides that a widow (as defined in Section 216(c) is entitled to mother's benefits if, among other conditions not here relevant, she has in her care a child of such insured individual entitled to a child's benefit.

Section 216(e) of the Act, 42 U.S.C.A. § 416(e), defines the term "child" as the natural child of an individual, an adopted child, or a stepchild.

Section 216(c) of the Act, 42 U.S.C.A. § 416(c), defines the term "widow", among other conditions not here pertinent, to mean the surviving wife of an individual, if she is the mother of his son or daughter, or was married to him for a period of not less than one year immediately prior to his death.

Section 216(h) (1) of the Act, 42 U.S.C.A. § 416(h) (1), requires that in determining whether applicant-claimant is the widow of decedent-wage earner, the law which would be applied in determining the devolution of intestate personal property by the courts of the state (here Arkansas) in which the insured decedent was domiciled at the time of death, shall be invoked. The law of Arkansas must therefore be considered to determine whether claimant and decedent were validly married at the time he died.

The facts are undisputed. Decedent, S. J. Marek, and one Mary Lee Maupin were lawfully married on December 6, 1941, in Arlington, Virginia. From this marriage, one child, Marilyn, was born May 7, 1945 (Tr. 77, 99), who has been awarded child's insurance benefits (Tr. 96). The parties separated and a divorce decree "a mensa et thoro" was entered August 14, 1953, by the Circuit Court of Arlington County, Virginia (Tr. 153–154). On August 16, 1954, that court granted Mary Lee Marek a divorce "a vinculo matrimonii", the decree containing a prohibition against either party remarrying within four months from entry of decree (Tr. 99–100, Exh. 15).[1]

Less than two months later, on October 3, 1954, claimant and decedent were ceremonially married in Cape Girardeau, Missouri (Tr. 98, Exh. 14). No children were born to this "marriage". However, claimant's two minor children by a prior marriage lived with claimant and decedent. Claimant's prior marriage to one Swafford was terminated by divorce on April 29, 1954, in Fairfax, Virginia (Tr. 89).

Claimant and decedent lived together in Poplar Bluff, Missouri, until November 1, 1956. The parties next lived in Little Rock, Arkansas, until the death of wage earner on August 13, 1957. According to claimant, the couple had no other places of residence during their "marriage" (Tr. 54–55), but subsequent to insured's death claimant moved to Texas (Tr. 94).

Claimant and decedent made two trips to Texas during their "marriage". The first was a honeymoon trip in October 1954 (which was within the four months' prohibition period) to Ft. Worth, where they stayed for three or four days, and during which decedent attended a business meeting (Tr. 61–62). In Ft. Worth they lived together as man and wife, and claimant was introduced as decedent's wife (Tr. 62). The second trip was in the fall of 1955 when the couple visited decedent's mother in Brenham, Texas, for about a week, and claimant was introduced to his friends and relatives as his wife (Tr. 61–63). Claimant testified that at all times from the date of their marriage ceremony to the date of decedent's death they lived together as man and wife (Tr. 65). Claimant stated she "was aware of the waiting period in Virginia" but "did not know it would extend outside of Virginia", and that "my husband said he had discussed it with an attorney in Missouri, who said it would make no difference" (Tr. 94).

Wage earner died on August 13, 1957, domiciled in Arkansas (Tr. 55, 88). He left a will which was probated in the Probate Court of Pulaski County, Little

---

[1]. This prohibition against remarriage was pursuant to Section 20–118, Code of Virginia, which provides in pertinent part:

"Dissolution of bond of matrimony; neither party to marry for four months —On the dissolution of the bond of matrimony for any cause arising subsequent to the date of marriage, neither party shall be permitted to marry again for four months from the date of such decree, *and such bond of matrimony shall not be deemed to be dissolved as to any marriage subsequent to such decree, or in any prosecution on account thereof, until the expiration of such four months; * * *.*" (Emphasis supplied.)

Rock, Arkansas. In this will, which decedent executed on June 27, 1956, he referred to the claimant as his "second wife", and appointed her as independent executrix. Claimant, in her petition of September 6, 1957, for probate of decedent's will, described herself as his wife (Tr. 130), and the Probate Court entered an order probating the will and appointing her as executrix of decedent's estate (Tr. 124–125). Based upon plaintiff's "verified petition" of September 19, 1957 (Tr. 126–127), the Probate Court on the same day entered its "Order Awarding Statutory Allowances", wherein it found "that petitioner is the widow of the decedent * * *" and awarded her "certain statutory allowances" (Tr. 122). Subsequently, on March 14, 1958, claimant elected to take against the will (Tr. 123), and by order of April 21, 1958, the Probate Court awarded, "Dower due widow, Clarice Marek * * *" (Tr. 109–110).

Claimant submits four propositions in urging reversal of the Secretary's determination: (1) the Missouri marriage between claimant and decedent was valid notwithstanding that it was entered into within the four month prohibitory period following the Virginia divorce decree; (2) if not valid, the marriage was only "voidable", and since not set aside during the lives of both parties it "was unimpeachable for all time" (Tr. 18); (3) even if the ceremonial Missouri marriage was void, there was a valid common-law marriage during the above mentioned visits of the pair to Texas; and (4) the Arkansas Probate Court determined that plaintiff-claimant was decedent's widow, and its orders that she was "entitled to certain allowances and the widow's option or election not to take under the will, * * * are entitled to full faith and credit among the several states." (Tr. 19).

■ I shall first discuss claimant's chief contention, namely, that her ceremonial marriage in Missouri to decedent was valid, despite the fact that it was solemnized during the prohibitory period of the Virginia decree. Decedent's last domicile, Arkansas, looks to the law of the place where a marriage was contracted to determine the validity of such marriage. Feigenbaum v. Feigenbaum, 1946, 210 Ark. 186, 194 S.W.2d 1012.[2] At the time of the Missouri marriage in October 1954, Section 20–118, Code of Virginia, not only contained the four months prohibition period, but declared further, " * * * such bond of matrimony shall not be deemed to be dissolved as to any marraige subsequent to such decree * * until the expiration of such four months * * *".

■ The court refers to controlling Missouri law then, as would Arkansas, to determine the effect to be accorded Section 20–118, Code of Virginia. If this Virginia statute did no more than impose a prohibition against remarriage for the specified period, Missouri would regard such prohibition as of no extraterritorial effect and hence consider the Missouri marriage valid. In re Leete, 1920, 205 Mo.App. 225, 223 S.W. 962; Green v. McDowell, 1922, 210 Mo.App. 517, 242 S.W. 168; Wheelock v. Freiwald, 8 Cir., 1933, 66 F.2d 694. If, however, the Virginia decree did not completely dissolve the prior marriage for all purposes—if during the four months the parties to the divorce were still man and wife—Missouri would not consider the marriage of claimant and decedent as valid. Jordan v. Missouri & Kansas Telephone Co., 1909, 136 Mo.App. 192, 116 S.W. 432; Cavanaugh v. United States, D.C.W.D.Mo.1951, 94 F.Supp. 776.

■ There are no Missouri decisions construing this particular Virginia statute and its bearing on marriages entered into during the prohibited period. After examination of the rationale of the previously cited Missouri cases, there is every reason to believe that Missouri would

2. Section 55–110, Arkansas Statutes Annotated—"Marriages contracted out of state—Validity—All marriages contracted without this State, which would be valid by the laws of the State or country in which the same were consummated, and the parties then actually resided, shall be valid in all courts in this State."

follow the interpretation placed upon the Virginia act by Virginia courts. I turn then to that interpretation.

The view of the Supreme Court of Appeals of Virginia is that a marriage celebrated within the four months after a Virginia decree which, as the one at bar, embodied the provisions of Section 20–118, is void in Virginia and other states, irrespective of where contracted. Heflinger v. Heflinger, 1923, 136 Va. 289, 118 S.E. 316, 32 A.L.R. 1088. In this case after noting that the statute provided first that neither party would be permitted to remarry during the four months (a provision not generally given extraterritorial effect), the Virginia tribunal went on to point out that the act also declared that as to any marriage subsequent to such decree the preexisting marriage was not to be considered dissolved for the statutory period.[3]

■ This interpretation (which is the one relied upon by defendant) was ac-cepted by the Supreme Court of Appeals of West Virginia in Johnson v. State Compensation Commissioner, 1935, 116 W.Va. 232, 179 S.E. 814. Relying on Heflinger, supra, the West Virginia court held that a West Virginia remarriage within the specified period following a Virginia divorce was void. The United States Court of Appeals for the District of Columbia recently had occasion to consider the effect of Section 20–118 in Dillard v. Dillard, 1960, 107 U.S.App.D.C. 214, 275 F.2d 878. The court stated that for all purposes other than remarriage, the Virginia decree immediately destroyed the relationship, but that it was only provisional insofar as the capacity of the parties to remarry was concerned.[4] As demonstrated above, since the Virginia decree of divorce which the decedent's first wife obtained, did not, as to any subsequent marriage, dissolve their marriage until expiration of the four month period, his "marriage" to claimant,

3. The Virginia court stated in 118 S.E. at pages 320–321:

"Section 5113 of the Code (now Section 20–118) is a new statute, introduced into the statute laws of the state for the first time in the Code of 1919. There must have been a reason for its introduction, and, as the language used is different from that of the statutes of other states on the subject, which had been construed by their appellate courts, we may safely assume that the revisers had some knowledge of those statutes, and of the construction placed upon them, and intended to propose to the Legislature, and that the Legislature in enacting it intended to enact something different from the statutes of those states. That section declares that 'neither party shall be permitted to marry again for six months from the date of such decree.' That was a common provision of such statutes, and it was often, if not generally, held that it simply imposed a penalty on the offending party, and did not affect the validity of the second marriage outside of the state if the said marriage were valid in the latter state. But the statute did not stop here; it went further, and declared: 'And such bond of matrimony shall not be deemed to be dissolved as to any marriage subsequent to such decree * * * until the expiration of such six months'.

As to any subsequent marriage, there was no divorce. The 'bond of matrimony' created by the first marriage was not dissolved so as to permit another marriage."

4. In Dillard, the court, per Mr. Justice Burton sitting by designation, said in relevant part at 275 F.2d at pages 881–882:

"The purpose of § 20–118 is well explained by the highest court of Virginia in Heflinger v. Heflinger, 1923, 136 Va. 289, 118 S.E. 316, 32 A.L.R. 1088. That leading case demonstates that the statute was the result of a considered public policy, enacted into law in 1919, to discourage the practice of entering into another marriage shortly after the issuance of a Virginia divorce decree. To discourage this, each party to the divorce was expressly prohibited from marrying again for six months from the date of the decree. In 1944 the six-month period was reduced to four. It was recognized, however, that although this express prohibition would be effective in Virginia, it would not be effective against a subsequent marriage promptly consummated under the law of another State. To forestall such an evasion, a further clause was added. It provided that *as to any marriage subsequent to the decree, the decree would not dissolve the bond of matrimony for six months*."

entered into in Missouri within the four month period, was void and would be so regarded by the courts of Virginia and Missouri, and hence also by the courts of Arkansas. Claimant's chief contention is without merit.

There is obviously no validity to claimant's second argument, namely, that if her Missouri marriage was invalid, it was only "voidable", and since not set aside during the lives of both contracting parties, it was unimpeachable for all time. This contention is swiftly disposed of—we are not dealing with a "voidable" marriage at all. The Missouri marriage was "void" per Heflinger, supra.

■■ Equally without merit is claimant's "third proposition", i. e., even if the ceremonial marriage in Missouri was void, there was a subsequent common-law marriage during the aforesaid visits of claimant and decedent to Texas, a state which recognizes common-law marriages, unlike Missouri and Arkansas.[5] The "honeymoon" trip to Ft. Worth in October 1954 was during the four months period; by the same token that decedent was incompetent to contract a valid ceremonial marriage during that period, he was *a fortiori* also incompetent to contract a valid common-law marriage. The later trip to Texas in 1955 is equally unavailing. Kelly v. Consolidated Underwriters, Tex.Civ.App.1927, 300 S.W. 981, affirmed Tex.Com.App.1929, 15 S.W.2d 229, holds that such a temporary sojourn in Texas by nondomiciliaries does not result in a common-law marriage, where such a visit was without intention of acquiring residence in Texas.[6]

■ I come to claimant's final contention to the effect that "full faith and credit" must be given to the Arkansas Probate Court orders recognizing her as decedent's widow, granting certain allowances, and permitting the widow's election not to take under the will. Such orders, however, are in no way controlling in the present proceeding. The Secretary-defendant neither was, nor could he properly have been, a party to the Probate Court proceedings. The Secretary had no opportunity in those Arkansas proceedings to contest claimant's statement that she was wage earner's lawful widow. Manifestly, the Secretary is not bound by such an ex parte, incidental finding. Nigro v. Hobby, D.C. D.Neb.1954, 120 F.Supp. 16, supports this conclusion.[7]

So far as is known to this court, the natural father of the stepchildren is living and has the legal and moral obligation to support them. No hardship is apparent so far as they are concerned. This, however, does not affect the legal problems involved.

The decision of the Secretary is right and will be affirmed. Defendant's motion for summary judgment will be granted. The clerk will notify counsel to draft and submit judgment accordingly.

---

5. These Texas cases recognize common-law marriages and detail essential elements thereof: Curtin v. State, 1951, 155 Tex.Cr.R. 625, 238 S.W.2d 187; Ray v. Thompson, Tex.Civ.App.1953, 261 S.W.2d 195; Shelton v. Belknap, 1955, 155 Tex. 37, 282 S.W.2d 682.

6. As correctly stated by the referee (Tr. 11):
"There is no evidence indicating that the claimant and the wage earner ever established a residence or domicile in the state of Texas or any other state that recognizes common-law marriages. It appears clear that even though the claimant and the wage earner were briefly in Texas and held themselves out as man and wife such a limited sojourn in the state would not be sufficient to establish a valid common-law marriage."

7. These cases reject similar res judicata claims for ex parte, state proceedings: Ramsey v. United States, 5 Cir., 1932, 61 F.2d 444; Fennell v. United States, 5 Cir., 1933, 67 F.2d 768; Jacobs v. United States, 5 Cir., 1940, 112 F.2d 51.